06-4730-cv
Roberts v. Royal Atlantic Corporation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: December 11, 2007        Decided: September 18, 2008)

Docket No. 06-4730-cv

-------------------------------------

JUNE ROBERTS, STEPHEN LEE AND SUFFOLK INDEPENDENT LIVING ORGANIZATION (SILO),

Plaintiffs-Appellants,

ANITA BRADLEY, ELIZABETH GARDNER,

Plaintiffs,

- v -

ROYAL ATLANTIC CORPORATION, ROYAL ATLANTIC NORTH CORPORATION, ROYAL ATLANTIC RESTAURANT CORPORATION, THEMISTOCLES KALIMNIOS, ANTHONY KALIMNIOS, STEVEN KALIMNIOS, OCEAN REALTY HOLDING CORPORATION, DES REALTY CORPORATION, and STAR DEVELOPMENT REALTY HOLDING CORPORATION,

Defendants-Appellees.

-------------------------------------

Before:   JACOBS, Chief Judge, POOLER and SACK, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge), following a bench trial, in favor of the defendants.  The court decided that 28 C.F.R. § 36.402(a), promulgated under Title III of the Americans With Disabilities Act, 42 U.S.C. § 12182 et seq., which, under specified circumstances, requires that altered portions of public accommodations be made accessible to the

disabled, does not apply because there is no evidence that any part of the defendants' property was altered after 1992, a prerequisite to the applicability of the regulation. The court further concluded that the defendants' statutory obligations under the Act to remove architectural barriers under certain circumstances did not apply because the plaintiffs had not established that their proposals for removal would be "readily achievable" under the terms of the Act.

Vacated and remanded.

MARTIN J. COLEMAN, Hauppauge, NY, for Plaintiffs-Appellants;

ALLAN M. CANE, Fairfield, CT, for Defendants-Appellees.

SACK, Circuit Judge:

The plaintiffs-appellants are disabled individuals -- most of whom require a wheelchair for mobility -- and a non-profit organization that provides services for, and advocates on behalf of, disabled persons in Suffolk County, New York. In a complaint filed in the United States District Court for the Eastern District of New York, the plaintiffs allege that the defendants, who own and manage a resort complex in Suffolk County ("Resort"), violate Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12182 et seq., because the Resort's rooms and facilities are not wheelchair-accessible. The plaintiffs sought injunctive and declaratory relief, attorneys' fees, and costs. Following a bench trial, the district court (Leonard D. Wexler, Judge) filed Findings of Fact and Conclusions

2

of Law and, on the basis thereof, entered judgment in favor of the defendants.

For the reasons that follow, we vacate the district court's judgment and remand for further proceedings.

**BACKGROUND**

We summarize here those findings of fact relevant to this appeal that were made by the district court judge following the bench trial.

The Resort consists of several buildings containing apartment units located on oceanfront property in Montauk, New York. The Resort is organized for legal purposes as distinct residential cooperative corporations. Two of them are among the defendants here -- the Royal Atlantic Corporation ("Royal Atlantic South") and the Royal Atlantic North Corporation ("Royal Atlantic North").

Royal Atlantic North owns thirty-nine units of the Resort in a complex of five two-storey buildings. Royal Atlantic South owns ninety-eight units in a complex of six two-storey buildings. None of the buildings has an elevator.

Most of the Resort's units are between 250 and 450 square feet in area and include a bathroom and small kitchen. Each complex has one pool surrounded by a narrow deck. Each complex also has an associated parking lot. Although there are ramps leading from these lots to the Resort buildings, they are too narrow for a wheelchair to navigate and, for that reason among others, are not ADA-compliant. Both parking lots are

relatively narrow (approximately fifty feet wide) and have gravel surfaces.

The two cooperative corporations also own the Resort's land and buildings. They lease units to individuals and entities known as "proprietary tenants" who are in turn shareholders in one or more of the corporations. Many proprietary tenants rent their units to members of the general public during the summer, although they may, of course, choose to occupy their own units during that period instead.

Units available for rent are typically advertised on the Resort's website. Defendant Double K Management Corporation ("Double K") acts as a sales agent for the rentals. Double K also serves as a management agent to provide maid, maintenance, and other services for each unit.

Each proprietary tenant leases his or her unit from one of the two corporations on terms that require that the tenant keep the interior of the unit -- anything within its walls -- in good repair. The corporations bear the responsibility for all other maintenance and repair related to the buildings, walkways, surrounding areas, and other common areas.

In June 2003, plaintiff Stephen Lee ("Lee"), who because of his disability must use a wheelchair to move about, was a guest at the Resort. Upon his arrival, he had difficulty navigating his wheelchair through the gravel-covered parking lot and was unable to ascend steps leading to the Resort office in order to check in.

4

Lee experienced daily frustration and embarrassment during the remainder of his stay. He was unable to use the bathroom in his unit because its doorway was too narrow to accommodate his wheelchair. As a result, he was forced to enlist family members to assist him. Lee was also unable to reach either of the Resort's pool areas in his wheelchair.

One of the other plaintiffs, June Roberts, uses a wheelchair and is the director of plaintiff Suffolk Independent Living Organization ("SILO"), a not-for-profit corporation that acts as an advocate for disabled individuals in Suffolk County. Roberts testified that she visited the resort in April 2003 hoping to find a suitable location for a SILO conference, found that the Resort was not accessible, and was unable to use a grant for a conference because of the lack of accessible, affordable accommodations in Montauk. In February 2004, Lee and the other plaintiffs filed the complaint initiating this lawsuit.

A bench trial began on May 31, 2005. The district court examined the following issues relating to accessibility at the Resort: (1) the creation of accessible routes to Royal Atlantic South and Royal Atlantic North from their respective parking areas by way of ramps; (2) the configuration and modification of the parking areas at the Resort; (3) the creation of accessible parking spaces at Royal Atlantic South and Royal Atlantic North without substantially limiting the number of parking spaces or interfering with maintenance access to a cesspool; (4) access to the pool areas located at the Resort; and

5

(5) the modification of some, but not all, of the previously altered apartment units.  Roberts v. Royal Atl. Corp., 445 F. Supp. 2d 239, 244, 246 (E.D.N.Y. 2006).

At one point in the proceedings, the parties agreed that a report by an independent architect evaluating the feasibility of bringing the resort into compliance with the ADA would be prepared in hopes that it would facilitate a settlement.

On August 15, 2006, the court rendered its Findings of Fact and Conclusions of Law.  Among the latter, it decided, that Lee had standing to bring this action,  and that the Resort was a place of public accommodation under 42 U.S.C. § 12181(7)(A).[1]

As the court further recognized, regulations adopted pursuant to the ADA impose access requirements on alterations made to public accommodations after January 26, 1992.  See 28 C.F.R. § 36.402(a);[2] see also 28 C.F.R. § 36.402(b) (an

---

[1]  42 U.S.C. § 12181(7)(A) provides in pertinent part:

The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce --

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor . . . .

[2]  Section 36.402(a) provides:

Any alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are

6

"alteration" is "a change to a place of public accommodation . . . that affects or could affect the usability of the building or facility or any part thereof"). The court decided, however, that the ADA's access requirements did not apply here because "[t]here was no evidence that the Resort underwent any alteration after 1992" within the meaning of ADA regulations. Roberts, 445 F. Supp. 2d at 247.

As the district court also noted, the ADA requires removal of architectural barriers, regardless of whether alterations have been made, "where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv);[3] see 42 U.S.C.

---

readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

28 C.F.R. § 36.402(a).

[3] Section 12182 provides in pertinent part:

(a) General rule. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

. . . .

[(b)(2)(A)]: Discrimination. For purposes of subsection (a), discrimination includes --

. . . .

[iv] a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an

7

§ 12181(9) ("'[R]eadily achievable' means 'easily accomplishable and able to be carried out without much difficulty or expense.'"). The court concluded, however, that the plaintiffs had the burden of proving that the modifications they sought would be "readily achievable" and that they failed to meet that burden. Roberts, 445 F. Supp. 2d at 248.

Based on these conclusions, the court entered judgment in favor of the defendants. The plaintiffs appeal.

**DISCUSSION**

On appeal from a judgment after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo. Mixed questions of law and fact are also reviewed de novo. Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 354 F.3d 112, 115 (2d Cir. 2003).

I. Standing

The defendants do not dispute, and we agree with, the district court's determination that Lee had standing to seek all of the relief that he pursued before the district court at trial: wheelchair access to, from, and within the parking lots, pools, and within at least two apartment units. However, we note that

---

> establishment for transporting
> individuals (not including barriers
> that can only be removed through
> the retrofitting of vehicles or
> rail passenger cars by the
> installation of a hydraulic or
> other lift), where such removal is
> readily achievable . . . .

42 U.S.C. § 12182 (emphasis added).

8

SILO is asserting standing as an organization based on its inability to book hotel rooms in Montauk for its disabled employees and conference participants. In light of the number of disabled SILO employees and conference participants, it may be that SILO's injury as an organization would not be redressed by an injunction requiring Royal Atlantic to bring several units into ADA compliance. Therefore, on remand to the extent that SILO or any other plaintiff seeks relief distinct from that sought by Lee or on different claims than those pursued by Lee, the district court should consider whether each such plaintiff has standing.[4] In this connection, we note that 42 U.S.C. § 12188(a)(1) provides that "[n]othing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions."

II. Legal Framework

Title III of the ADA prohibits discrimination against individuals "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public

---

[4] The relief originally sought by the plaintiffs in their complaint included, inter alia, "Braille or enlarged font" signs and restaurant menus for persons with severe, uncorrected visual impairments. There is no allegation that Lee has a visual impairment; we therefore doubt he would have standing to seek such relief. But in the course of the district court proceedings the plaintiffs abandoned their claims related to this relief. We need not and do not address those claims here.

accommodation . . . ." 42 U.S.C. § 12182(a). A Title III claim therefore requires that a plaintiff establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA. See Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008). There is little dispute that the first two requirements have been met. At issue is the third: whether the inaccessibility of the Resort to wheelchair users constitutes discrimination under the ADA.

The ADA describes discrimination in both general and specific terms. Two provisions are relevant to this appeal. The first, which addresses the making of alterations, provides that "discrimination" includes,

> with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. Where the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations

10

in terms of cost and scope (as determined under criteria established by the Attorney General).

42 U.S.C. § 12183(a)(2) (emphasis added).  The second provides that "discrimination" includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."  Id. § 12182(b)(2)(A)(iv).

We must therefore first determine whether a challenged facility (or part thereof) has been "altered" in "a manner that affects or could affect its usability."  If alterations have been made, a defendant "discriminates" if those altered areas -- and paths of travel to altered areas that "contain[] a primary function" -- are not made readily accessible to disabled individuals "to the maximum extent feasible."  Id.  Even in the absence of alterations, a defendant nonetheless "discriminates" if it fails to remove any existing barriers to accessibility where such removal "is readily achievable."  Id. § 12182(b)(2)(A)(iv).

A.  When Is a Facility "Altered"?

The ADA does not expressly define the term "altered." The Department of Justice's implementing regulations, however, define "alteration" as "a change to a place of public accommodation or commercial facility that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b).  The regulation describes by illustration what constitutes an alteration.

Alterations include, but are not limited to, remodeling, renovation, rehabilitation,

11

> reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations <u>unless they affect the usability of the building or facility</u>.

28 C.F.R. § 36.402(b)(1) (emphasis added).

Under the implementing regulations, then, the concept of "usability" appears to be central to determining whether an alteration has been made. And the Department of Justice has commented that it "remains convinced that the [ADA] requires the concept of 'usability' to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544, 35,581 (July 26, 1991) ("Title III Final Rule"). The absence of a formal definition, however, renders interpretation a challenge. Neither the statute nor the regulation specifies the allocation of burdens of production and persuasion between the parties in establishing whether a facility has been altered.

The illustrations provided at section 36.402(b)(1), for example, suggest a distinction between major and minor changes to a facility -- relative to its overall size -- as well as between changes that do and do not affect the activities that can be performed in the facility, particularly those that are dependent on a facility's physical layout.

12

The ADA's requirement that "new construction," like altered facilities, be made "readily accessible and usable" to disabled individuals provides a separate and useful reference point. See 42 U.S.C. § 12183(a). The greater the change made by a modification to a facility or portion of a facility, the closer it is, in effect, to new construction. This is consistent with the relativity principle in section 36.402(b)(1): The more a place is altered, the easier and cheaper it becomes, in both absolute and relative terms, to integrate incidentally features that facilitate ADA access. The ADA contemplates that both "alterations" and "new constructions" should be subject to similar accessibility requirements.

The concept of alteration seems generally to exclude from "alterations" those modifications that essentially preserve the status and condition of a facility, rather than rendering it materially "new" in some sense. As the cost, degree, or scope of a modification decreases, the likelihood that it approaches the equivalent of "new construction" or is therefore an alteration under the ADA also decreases. Even a relatively inexpensive or localized modification may, however, so fundamentally change the use of a facility that we would regard it as an alteration, particularly if it affects the purpose, function, or underlying structure of the facility.

Accordingly, our considerations for determining whether the modifications in this case are alterations under the ADA can (but need not) include factors such as:

13

1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof.

2. The scope of the modification (including what portion of the facility or relevant part thereof was modified).

3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility).

4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.[5]

Before making this assessment in the case before us, we must consider who bears the burden to establish that a modification is or is not an alteration. These regulations and commentary indicate that the concept of "alteration" is a relative one, requiring us to consider the nature, cost, degree, scope, and purpose of any alleged alteration. Our analysis is guided by our decision in Borkowski v. Valley Central School District, 63 F.3d 131 (2d Cir. 1995). There, we addressed the allocation of burdens for the analogous task of establishing a "reasonable accommodation" for purposes of the Rehabilitation Act, 29 U.S.C. § 794. See Henry H. Perritt, Jr., Americans with

_____

[5] Other cases may of course raise questions not at issue here, and the list is not meant to be exhaustive. See Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544, 35,581 (July 26, 1991) ("The Department remains convinced that the Act requires the concept of 'usability' to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities.").

14

Disabilities Act Handbook § 1.02 (4th ed. 2003) ("The definition of disability is identical under the [ADA and the Rehabilitation Act], as are the basic concepts of discrimination, reasonable accommodation, and program and facility accessibility.").

In Borkowski, we observed that in applying the Rehabilitation Act and related statutes, our case law bars us from placing both the initial burden of production and the ultimate burden of persuasion on either the plaintiff or the defendant. Instead, we follow a "middle course." Borkowski, 63 F.3d at 137. To establish a "reasonable accommodation," a plaintiff "bears only a burden of production" that "is not a heavy one." Id. at 138. That is, it would be "enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." Id.

We concluded in Borkowski that the plaintiff's burden does not require him or her to furnish exact or highly detailed cost estimates. Because defendants possess superior access to information regarding their own facilities, such as architectural plans, maintenance requirements and history, and the historical and projected costs of repairs and improvements, they are typically in a position far more easily to refute a plaintiff's proposal as unreasonable than is a plaintiff to prove otherwise. As we put it in Borkowski, the defendants have "far greater

15

access to information than the typical plaintiff, both about [their] own organization and, equally importantly, about the practices and structure of the industry as a whole." Id. at 137.

A similar analysis applies to our determination of whether a facility has been "altered." As in Borkowski and in light of our "alteration" analysis above, defendants can be expected to have superior access to information with which to refute assertions that their facilities have been altered within the meaning of the statute and the applicable regulations and commentary. To establish the existence of an alteration, a plaintiff fulfills his or her initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA. The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration.

If we determine that a particular modification is an alteration under the ADA, we must then decide whether the alteration was made readily accessible and usable to disabled individuals to the "maximum extent feasible." 42 U.S.C. § 12183(a)(2).

B.  When Is an Altered Facility Made Readily Accessible
    and Usable to the "Maximum Extent Feasible"?

As explained by regulation:

> The phrase 'to the maximum extent
> feasible' . . . applies to the occasional
> case where the nature of an existing facility
> makes it virtually impossible to comply fully
> with applicable accessibility standards
> through a planned alteration.  In these
> circumstances, the alteration shall provide

16

> the maximum physical accessibility feasible. Any altered features of the facility that can be made accessible shall be made accessible. If providing accessibility in conformance with this section to individuals with certain disabilities (e.g., those who use wheelchairs) would not be feasible, the facility shall be made accessible to persons with other types of disabilities (e.g., those who use crutches, those who have impaired vision or hearing, or those who have other impairments).

28 C.F.R. § 36.402(c). Section 12183's "maximum extent feasible" requirement does not ask the court to make a judgment involving costs and benefits. Instead it requires accessibility except where providing it would be "virtually impossible" in light of the "nature of an existing facility." 28 C.F.R. § 36.402(c). The statute and regulations require that such facilities be made accessible even if the cost of doing so -- financial or otherwise -- is high. Indeed, in promulgating the implementing regulations, the Department explicitly rejected suggestions that cost be considered with respect to this provision. See Title III Final Rule, 56 Fed. Reg. at 35,581 ("The legislative history of the ADA indicates that the concept of feasibility only reaches the question of whether it is possible to make the alteration accessible in compliance with this part. Costs are to be considered only when an alteration to an area containing a primary function triggers an additional requirement to make the path of travel to the altered area accessible."); id. ("Any features of the facility that are being altered shall be made accessible unless it is technically infeasible to do so.").

17

Only if there is some characteristic of the facility itself that makes accessibility "virtually impossible," then, may the provision of access be excused. Even in such cases, accessibility must be provided for all types of disabilities for which nondiscrimination is possible. For example, if a doorway is altered but the hallways leading to and from the doorway remain unaltered and too narrow for wheelchairs, this would seem to be the sort of "technical infeasibility," Title III Final Rule, 56 Fed. Reg. at 35,581, that would excuse a failure to provide accessibility. The owner would nonetheless be required to render maximal accessibility for other kinds of disabilities. Furthermore, because both the statute and regulations require that the alterations themselves be made to provide the maximum feasible accessibility, a court's assessment of feasibility must be made with respect to the state of the facility before the alterations in question were made, rather than the facility's post-alteration state.

Although the "maximum extent feasible" standard is not a relative phrase in the same sense as is a reasonableness requirement, the applicable burdens of production and persuasion remain appropriately drawn from Borkowski, for the standard requires a similar degree of reliance on facilities-related information to which defendants would be expected to have superior access. So, once a plaintiff has met an initial burden of production identifying some manner in which the alteration could be, or could have been, made "readily accessible and usable

18

by individuals with disabilities, including individuals who use wheelchairs," the defendant then bears the burden of persuading the factfinder that the plaintiff's proposal would be "virtually impossible" in light of the "nature of the facility."  42 U.S.C. § 12183; 28 C.F.R. § 36.402.

Section 12183(b), it will be recalled, requires that if a covered entity undertakes an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity must also make the alteration so that, "to the maximum extent feasible," the path of travel to the altered area and certain other facilities -- bathrooms, telephones, and drinking fountains serving the altered area, 28 C.F.R. § 36.403 -- are readily accessible to and usable by individuals with disabilities, provided the alterations required by this provision are not disproportionate to the overall alterations in terms of cost and scope or that the original alteration did not affect, nor could have affected, the usability of the facility.  The same Borkowski burden-shifting mechanism applies when considering compliance in this regard.

The proportionality requirement limits the extent to which supporting areas must be made accessible.  This changes the burdens placed on ADA plaintiffs and defendants.  A plaintiff challenging the accessibility of the paths of travel, restrooms, telephones, and drinking fountains serving an altered area containing a primary function bears an initial burden of production that the area in question is covered by the statute

19

and that the desired access may be achieved with a cost and scope not disproportionate to the overall alteration. This burden may be met with cost estimates that are facially plausible, without reference to design details, and are such that the defendant can assess its feasibility and cost. Once this burden is met, the defendant must persuade the factfinder that the cost and scope of compliance would, in fact, be disproportionate, or that the areas in question are not paths of travel (or restrooms, telephones, or drinking fountains) within the meaning of the statute and regulations.

C. When is the Removal of an Architectural Barrier "Readily Achievable"?

We conclude that the Borkowski approach is also appropriate when considering the removal of barriers under 42 U.S.C. § 12182(b)(2)(A)(iv), which applies even to facilities that are neither new nor altered, and that are not paths of travel, bathrooms, telephones, or drinking fountains serving an altered area. When evaluating a claim under this provision, we require a plaintiff to articulate a plausible proposal for barrier removal, "the costs of which, facially, do not clearly exceed its benefits." Borkowski, 63 F.3d at 138. Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed the benefits. Because the concept of "readily achievable" is a broad one, either party

20

may include in its analysis, as costs or benefits, both monetary and non-monetary considerations.[6]

### III.  Wheelchair Access at the Resort

We examine the plaintiffs' claims for relief as they have been presented on appeal within the legal framework set forth in Part II of this opinion, above.  Our analysis is limited to the same issues considered by the district court regarding wheelchair access within, to, and from the parking areas and pool areas, and the modification of any two units to be usable by wheelchair users.  We address only the issues that have been brought before us, which do not, of course, include whether the defendants have other obligations under the ADA.

### A.  Unit Accessibility

The first question is whether the units at the Resort have been altered within the meaning of the ADA and applicable regulations.  This inquiry is a mixed question of law and fact.  We therefore review de novo the district court's conclusion that "[t]here was no evidence that the Resort underwent any alteration after 1992."  Roberts, 445 F. Supp. 2d at 247.  We review the court's underlying factual findings for clear error.

---

[6]  This view of the plaintiff's initial burden departs somewhat from that expressed by the Tenth Circuit in Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I, 264 F.3d 999 (10th Cir. 2001), where the court required that a plaintiff furnish "precise cost estimates" and "specific design" details regarding his proposed accommodation.  Id. at 1009.  We think that this asks too much of the typical plaintiff, particularly where defendants can so quickly dispose of non-meritorious claims by reference to their knowledge and information regarding their own facilities.

Based on the record and the district court's findings of fact, we conclude to the contrary, and as a matter of law, that a large fraction of the Resort's rooms were altered in the course of renovations made in 2000 and 2001. The district court did not make any specific findings regarding these renovations, but there is ample evidence to convince us that the affected units were altered then.

The minutes of a meeting of shareholders of the Royal Atlantic Cooperative Corporation,[7] held December 13, 1999, reported the shareholders' view that the "[b]athrooms and [k]itchens need[ed] to be [r]enovated for the 2001 season." The minutes explained that:

> In 1995 suggestions were made by owners, management and guests in reference to the condition of the bathrooms and kitchens. At that time management was asked to be aware but not pursue renovations. Through the years, we have done everything possible to repair and maintain these items. At this time their age (23-27 years) and wear are entirely to[o] evident. Their condition has progressed, and only a hand[ful] of rooms are in satisfactory shape.

Minutes of the Sixteenth Annual Shareholders Meeting of Royal Atlantic Cooperative Corp., Dec. 13, 1999, at 5 ("1999 Minutes"). The estimated costs and scope of the renovations to each unit were described as follows:

> Bathroom: $3,740.00

> Complete gut to studs, install wonderboard at tub surround and sheetrock remainder, install

---

[7] The plaintiffs presented evidence of unit alterations only for those owned by Royal Atlantic South.

new floor tiles on mud base, wall tiles, shower enclosure, light fixture, tub and shower body, toilet, lavatory and faucet, spackle and paint.

Kitchen: $1,364.00

Remove and replace linoleum floor, baseboard molding and kitchen cabinets. Replace sink, faucet and stove as needed. Replace electric outlets to G.F.I., spackle and paint.

Id. at 6. The minutes stated that these renovations would "start at the end of the 2000 season and [be] completed the spring of year 2001. The actual cost for this project will be billed directly to the unit owners and collected from the rental . . . of the year 2000 season." Id. These renovations, according to the minutes, would "offer our guests yet another reason to continue their patronage at our unique seaside resort." Id. at 5-6.

The minutes of the shareholder meeting of the following year, 2000, confirmed the progress being made with respect to these renovations. The minutes noted that "[r]enovation is on schedule[.] [A]ll rooms have been gutted and the repair stages are in full swing. The only problems so far ha[ve] been that there appears to have been more rotted floors and joists th[a]n anticipated." Minutes of the Seventeenth Annual Shareholders Meeting of Royal Atlantic Corp., Dec. 11, 2000, at 7. And one year after that, the minutes of the annual meeting noted that during 2001, Royal Atlantic had "[c]ompleted renovations to 100 bathrooms, kitchens, and foyers." Minutes of the Royal Atlantic Corp. Stockholders Meeting, Dec. 12, 2001, at 4. The kitchen and

23

bath renovations cost a total of $527,095.00, which included the installation of certain ADA-compliant fixtures such as faucets, grab bars, tiles, and linoleum. Id., addendum.

There is thus little doubt that the kitchens and bathrooms of the renovated rooms had been "altered" within the meaning of the ADA. First, as a renovation, these modifications easily fall within the illustrative examples of alterations at 28 C.F.R. § 36.402(b)(1). By performing a "gut to studs," Royal Atlantic essentially rebuilt the bathrooms and kitchens. The defendants would therefore have had ample opportunity to perform the renovations in a way that would ensure access by the disabled.

Moreover, this renovation work affected the vast majority of rooms at Royal Atlantic South. Its extensive nature suggests that the conversion of only a few units to be more fully accessible could have been achieved with a relatively small marginal increase in difficulty and cost compared to the overall cost of the project. It also reflects Royal Atlantic's intent, in undertaking these renovations, to upgrade the facilities, rather than merely maintain them. Having done "everything possible to repair and maintain" the units' bathroom and kitchen facilities, 1999 Minutes at 5, it appears that normal maintenance was no longer sufficient in light of the facilities' age. In the course of updating and renovating these facilities, the defendants changed the usability of the units. The ensuing

24

modifications are therefore properly considered alterations under the ADA.

Because the renovations physically altered the Resort's units in a manner that affected their usability, the ADA requires that some of these units be made readily accessible and usable by disabled individuals "to the maximum extent feasible." See ADA Accessibility Guidelines ("ADAAG"), 28 CFR Part 36, App. A, revised July 1, 1994, §§ 9.1.2, 9.1.5 ("When sleeping rooms are being altered in an existing facility, or portion thereof," four rooms must be made accessible for every 76 to 100 altered rooms). The plaintiffs satisfied their initial burden of production by demonstrating that the defendants had not complied with the ADA in this regard, and by presenting a feasible proposal for renovating the rooms so as to make them wheelchair accessible.[8] The burden therefore shifted to the defendants to demonstrate that the prior alterations had been performed so that, "to the maximum extent feasible," the necessary proportion of units were each made readily accessible and usable by the disabled. Although there are reasons to doubt that this burden has been met, a decision on this issue requires a fact-intensive determination that cannot be resolved on the existing record. The district court should address this question in the first instance after taking such additional evidence as deemed

---

[8] Plaintiffs proffered an architect's report suggesting reasonably priced modifications that would render a typical unit wheelchair accessible. They would require adding accessories to the apartment and some renovations, which would enlarge the bathroom at the modest cost of some living space.

25

advisable in order to do so. As we have explained, only if achieving accessibility would be "virtually impossible" in light of the "nature" of the facility under 28 C.F.R. § 36.402(c) may the accessibility requirement be relaxed. On remand, the district court may not consider the comparative cost or scope of the proposed renovations. The feasibility of alterations should be ascertained with respect to the units' pre-alteration configuration, rather than their present state.

Similarly, the defendants' assertion that they do not now have the authority to renovate unilaterally specific units for accessibility has little bearing on whether they violated the ADA by renovating the kitchens and bathrooms without making any of them wheelchair accessible. Even if it is true that the cooperative corporation defendants have no unilateral power to interfere with individual proprietary leases, a proposition suggested by Double K in a 2003 letter to shareholders apprising them of this litigation, our inquiry under section 12183(b) is backward-looking. It asks whether, at the time the kitchen and bathroom renovations were performed, the defendants had made maximally feasible efforts to achieve the requisite level of accessibility. And although limitations on the defendants' authority arising from the ownership structure of a facility may be considered in evaluating the feasibility of compliance -- a facility's ownership structure may fairly be encompassed within the "nature" of that facility -- it seems to us that it would be

26

a rare case where such limitations could excuse the ADA's accessibility requirement.

Some of the factual issues the district court might consider addressing on remand are whether the defendants could have made some rooms wheelchair-accessible in the course of their renovations in 2000 and 2001 by offering to purchase units as they were offered for sale, by asking for volunteers among the individual unit owners whose costs for ADA compliance would be distributed among all owners, by offering additional compensation to those who volunteered their units, or by some other practicable and appropriate, even if costly, mechanism.

As explained at 28 C.F.R. § 36.403, "a 'primary function' is a major activity for which the facility is intended." Royal Atlantic's rooms are, of course, the central commercial offering of the facility. The units renovated in 2000 and 2001 were therefore undoubtedly areas of "primary function." As will be discussed, the paths of travel, bathrooms, telephones, and drinking fountains serving these rooms are also subject to the accessibility requirements of § 12183(b)(2), to the extent that this accessibility could have been achieved with cost and scope not disproportionate to the overall alteration.

B.  Parking Area Access and Accessibility

We apply a similar analysis to the Royal Atlantic parking areas, asking first whether those areas have been altered. The record is sparse with respect to the modifications made to these lots, beyond evidence that tons of gravel had been

27

added in 2000 and 2001. We therefore cannot, based on the existing record, make a determination as a matter of law as to whether the pool or parking areas have been altered. The district court should address this question on remand.

Should the district court conclude that the parking lots were altered, the defendants would, of course, be required to establish that they had been made readily accessible and usable to the maximum extent feasible; the plaintiffs have amply demonstrated the lots' inaccessibility to wheelchairs in satisfaction of their initial burden of production.

If, on the other hand, the district court concludes that the lots were not altered, then because the rooms were altered, and were areas of primary function, there is a question as to whether the lots are within the "path of travel" to the rooms, or to any other altered portion of the facility. See 42 U.S.C. § 12183(a)(2). If so, they must also be made accessible to the maximum extent feasible (provided the costs and scope of doing so are not disproportionate to the room alterations). If not, the less stringent "readily achievable" standard for existing facilities applies.

By regulation, a "path of travel" to an altered area includes "a continuous, unobstructed way of pedestrian passage by means of which the altered area may be approached, entered, and exited, and which connects the altered area with an exterior approach (including sidewalks, streets, and parking areas), an entrance to the facility, and other parts of the facility." 28

28

C.F.R. § 36.403(e)(1). "An accessible path of travel may consist of walks and sidewalks, curb ramps and other interior or exterior pedestrian ramps; clear floor paths through lobbies, corridors, rooms, and other improved areas; parking access aisles; elevators and lifts; or a combination of these elements." 28 C.F.R. § 36.403(e)(2). Although section 36.403(e) might be read to suggest that parking areas are no more than exterior approaches and not within the "path of travel" contemplated by statute, we think the better interpretation of this regulation is that the exterior approach refers to those structures that adjoin, and provide pedestrian access to, an owner's facilities, but that are not in fact part of those facilities. This interpretation is supported by the inclusion of "parking access aisles" as elements that may make up an accessible path of travel under 28 C.F.R. § 36.403(e)(2).

We conclude that the Royal Atlantic parking areas are along the path of travel to the rooms. They connect this area to the public street, which in this case provides the "exterior approach" to the Resort. Even if the parking lots were not "altered," then, they must still be made accessible "to the maximum extent feasible" at the time the alterations were made, subject to the proportionality limitation explained in detail at 28 C.F.R. § 36.403(f) and (g). However, because the path of travel for a person traveling by car begins at his or her parking space, this path need not include the entire parking area, only

29

the path from an accessible parking space to the areas of public function within the Resort.

Also, although we have focused only on the Resort units, there may be other areas of primary function that were altered and whose costs must be considered in determining whether the cost and scope of accessibility would be disproportionate. See 28 C.F.R. § 36.403(h)(2)(i) ("If an area containing a primary function has been altered without providing an accessible path of travel to that area, and subsequent alterations of that area, or a different area on the same path of travel, are undertaken within three years of the original alteration, the total cost of alterations to the primary function areas on that path of travel during the preceding three year period shall be considered in determining whether the cost of making that path of travel accessible is disproportionate."). Should the district court reach this question, a full analysis of alterations made to areas of public function would be required.

C. Access to Pool Areas

As with the parking lots, we cannot decide as a matter of law based on the existing record whether the Resort's pool areas were altered. This is another subject for the district court to consider upon remand.

Pool areas are obviously areas of primary function of a seafront, summer resort. If the district court concludes that they were altered, it would follow that the Resort was required to make paths of travel to these areas wheelchair accessible.

If the district court determines that the pool areas were not altered, the remaining question will be whether, because the pool was an existing facility, the defendants had failed to remove architectural barriers where such removal would be readily achievable as required under the ADA. In light of our discussion of the proper application of this provision, the district court -- should it reach this question -- must reconsider its prior analysis of the plaintiffs' proposed pool renovations.

In its findings of fact, the district court observed that the pool renovation "plan offered by Plaintiffs . . . failed to take into account shifting sands, fencing requirements, interference with balconies and the impact of a large ramp on the number of people allowed by law to enter the pool area." Roberts, 445 F. Supp. 2d at 246. As a consequence, the court concluded that "Plaintiffs failed in [their] burden" "to establish that the modifications sought . . . are readily achievable." Id. at 248.

In light of the relative burdens borne by each party, this analysis was flawed. The plaintiffs satisfied their initial burden of production by proffering plans -- proposed themselves or with the aid of the independent architect -- that would permit facially cost-effective wheelchair access to at least one of the pool areas.[9] The district court's finding that the plaintiffs had failed to take into account various other factors is of little import, for once the plaintiffs met their initial burden

---

[9] This included a proposal for a ramp leading to the pool.

31

of production, it was the defendants' responsibility to prove that the proposals were not readily achievable.

D.  Requirements If ADA-Compliant Remedial Measures Are "Not Readily Achievable"

An ADA regulation provides:

> If . . . the measures required to remove a barrier would not be readily achievable, a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with [ADA] requirements.  Such measures include, for example, providing a ramp with a steeper slope or widening a doorway to a narrower width than that mandated by the [ADA].  No measure shall be taken, however, that poses a significant risk to the health or safety of individuals with disabilities or others.

28 C.F.R. § 36.304(d)(2).  The purpose of the regulation is to "maximize the flexibility of public accommodations in undertaking barrier removal by allowing deviations from the [ADA's] technical standards," thereby promoting "certainty and good design at the same time that permitting slight deviations will expand the amount of barrier removal that may be achieved."  Title III Final Rule, 56 Fed. Reg. at 35,570.  Even if the defendants meet their burden, if one has been placed upon them, of demonstrating that the plaintiffs' proposals for the removal of existing barriers would not be readily achievable, the district court must then determine, under that regulation, whether any of these proposals would be readily achievable if certain ADA requirements were relaxed.

There is evidence that application of this rule might overcome some of the objections voiced by the defendants and the

32

district court. For example, it appears that the district court has not considered fully the independent architect's testimony that construction of a ramp in the north parking lot might be readily achievable if the ADAAG requirements were relaxed to permit a steeper ramp and the placement of accessible spaces further from the general route of travel than the ADAAG would otherwise allow. Similarly, although the defendants argue that the plaintiffs' proposal for a ramp leading to the north pool area would not comply with the ADA's five-foot width requirement because of the presence of a nearby transformer, the court did not address the architect's assertion that such a problem could be avoided if the ramp were constructed to be narrower than the standard width otherwise mandated by the ADAAG.

The flexibility provision changes somewhat the defendants' burden. In addition to establishing that the plaintiffs' proposals would not be readily achievable, defendants must also establish that the proposals would not be readily achievable even if ADA design requirements were relaxed. Both possibilities must be addressed by the district court.

E. Relief and Named Defendants

The district court expressed doubts as to whether it had the power to order the requested relief in light of the Resort's ownership structure and the defendants' explicit lack of authority to modify certain individual units at the Resort. See Roberts, 445 F. Supp. 2d at 246-47. The plaintiffs in this case named as defendants the cooperative corporations, the managing

33

authority, and some (but not all) unit owners, but they did not identify particular units for modification or identify and serve process on the owners of those units.

As an initial matter, we observe that the plaintiffs did properly identify at least some -- and perhaps all -- of the defendants contemplated by the ADA for claims under the ADA. In enacting the statute, Congress apparently intended that the prohibition against discrimination "appl[y] to any person who owns, leases . . . or operates a place of public accommodation." H.R. Conf. Rep. 101-558, 101st Cong., 2d Sess. (1990) (emphasis added). Of course, owners and operators of facilities may allocate by lease or contract their relative responsibilities for compliance with the ADA. See Americans with Disabilities Act Handbook at § 6.02. And the Department of Justice has provided informal guidance suggesting that the duty to remove barriers depends on who has legal authority to make alterations, "which is generally determined by the contractual agreement . . . ." Id. (quoting U.S. Dep't of Justice, Questions and Answers (rev. Sept. 1992)).

We cannot say, however, based on the existing record and factual findings, whether, in this case, the plaintiffs' claims for relief would fail based on the named defendants' potential inability to comply with orders of the district court directing modifications. Perhaps because the court concluded that no relief was available in the first place, it made no findings regarding the cooperative corporations' ability to

34

solicit individual unit owners to volunteer their units for renovation on a distributed cost basis or with compensation, to purchase specific units as corporate property as they come onto the market, for corporate owners of second-floor units to swap with owners of first-floor units, or to buy first floor units when they come available, or for the unit owners to take any other action to cause the Resort to become ADA-compliant.

If the district court, on remand, concludes that the plaintiffs are entitled to some or all of the relief they have sought, the court should, of course, inquire whether the named defendants can comply with an order to provide that relief. Perhaps the defendants may do so unilaterally; perhaps they may be able to solicit the assistance of individual unit owners. As we have already noted, section 12183 requires, with respect to altered facilities, that all feasible efforts be made toward compliance without regard to cost, and the same requirement would apply to complying with orders for relief pursuant to this provision. It may well be, then, that the named defendants are able to comply with orders to modify individual units, if required, in light of the defendants' admission that at least thirty units in fact change ownership each year.

Only if the district court finds that the named defendants, having exhausted all options, are unable to comply with its orders would it need to consider whether the plaintiffs had failed to identify and serve necessary and indispensable parties (such as individual proprietary tenants) under Fed. R.

35

Civ. P. 19.  We offer no view as to whether individual tenants would be proper defendants.  These remain issues for the district court in the first instance.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated and the cause remanded for further proceedings.