Hollynn D'LIL, Plaintiff,

v.

RIVERBOAT DELTA KING, INC.; City of Sacramento; Old Sacramento Business Association, Inc.; and Does 1 through 50, Inclusive, Defendants.

Civ. No. 2:11–2230 WBS AC.

United States District Court, E.D. California.

Signed Sept. 25, 2014.

1002

Timothy S. Thimesch, Thimesch Law Offices, Walnut Creek, CA, for Plaintiff.

Charles L. Post, Chelcey Emiko Lieber, Donna L. Holtz, Weintraub Tobin Chediak Coleman Grodin, Scott M. Plamondon, Weintraub Genshlea Chediak, Kathleen T. Rogan, Sacramento City Attorney, Sacramento, CA, for Defendants.

*MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR A STAY*

WILLIAM B. SHUBB, District Judge.

Plaintiff Hollynn D'Lil, a paraplegic, brought this action under the Americans

with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and analogous state laws against defendants Riverboat Delta King, Inc. ("Delta King") and the City of Sacramento arising out of the physical obstacles she allegedly encountered while visiting the Delta King. Delta King now moves for summary adjudication regarding certain alleged barriers pursuant to Federal Rule of Civil Procedure 56 or, alternatively, for a stay.

## I. *Factual & Procedural History*

The Delta King was a five-story vessel built over eighty-five years ago in the late 1920s. It carried passenger traffic between Sacramento and San Francisco until 1940. After some wartime service with the federal government, it had become a derelict vessel by the 1960s. By the 1980s, it was submerged near Rio Vista to the middle of the third deck. In 1984, the Coyne family purchased the vessel and brought it to Sacramento for restoration.

From 1984 to 1989, the Coyne family rehabilitated the Delta King, converting it from a passenger vessel to a hotel with a restaurant, theatre, bar and grill, and banquet facilities. During the rehabilitation, the Delta King maintained many of its original characteristics, such as slanted floors and narrow door widths. It is now berthed at 1000 Front Street in Old Sacramento and, while it still floats, it is no longer a sea-worthy vessel.

Since its original rehabilitation, patrons are able to board the Delta King through one of two gangways. The Elevator Gangway leads to the second deck and incorporates a floating barge with an elevator and stairs and has two configurations depending on the water level of the Sacramento River. The Aft Gangway is less than twenty-five feet from the Elevator Gangway and leads directly to the third deck of the Delta King. Within the Delta King, an elevator provides access to the first three decks, but there is not an adequate means for disabled patrons to access the fourth and fifth decks.

The Delta Bar and Grill is on the fourth deck of the Delta King. Although disabled patrons are unable to access the fourth deck, the Delta King provides a cocktail seating area at the base of the main staircase on the third deck where patrons can order any drinks or food offered at the Delta Bar and Grill. When the Delta Bar and Grill features live music about two to three times per week, disabled patrons are able to hear the music from the third deck. The Delta Bar and Grill also has a TV for patrons to view, but there is not a TV available in the seating area on the third deck.

In her Complaint, plaintiff alleges claims under (1) the public services provisions of the ADA, 42 U.S.C. § 12132, against the city; (2) section 504 of the Rehabilitation Act of 1973 against the city, 29 U.S.C. § 794; (3) the public accommodations provisions of the ADA against Delta King and the city, 42 U.S.C. § 12182; (4) California Health and Safety Code section 19955 against Delta King and the city; (5) California Government Code section 4456 against the city; (6) the California Disabled Persons Act ("CDPA") against Delta King and the city, Cal. Civ.Code § 54 *et seq.*; (7) the Unruh Civil Rights Act against Delta King and the city, Cal. Civ. Code § 51 *et seq.*; (8) California Government Code section 11135 against the city; (9) California Government Code section 12948 against Delta King and the city; and (10) state law negligence against Delta King and the city.

Plaintiff's Complaint details thirty-five pages of barriers on the Delta King that allegedly violate the ADA and analogous state disability laws. (*See* Compl. Ex. 1.) Delta King's motion for summary judg-

ment is limited to the following alleged barriers: 1) the slope of the gangways;[1] 2) vertical access to the fourth and fifth decks; 3) leveling of cambered decks; 4) removal of raised thresholds; and 5) configuration of the doors.[2]

## II. *Discussion*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the moving party can demonstrate that the nonmoving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be

1. Although plaintiff's Complaint and opposition to Delta King's motion for summary judgment appear to be limited to the slope of the Aft Gangway, Delta King indicated at oral argument that its motion for summary judgment addresses the slope of the Elevator and Aft Gangways.

2. In what appears to be petty bickering between the parties, Delta King contends that the court should disregard plaintiff's opposition and supporting filings as untimely, (Delta King's Reply at 16:2–18:12 (Docket No. 80); Docket No. 80–2); plaintiff objects to new arguments in Delta King's reply brief, (Docket No. 81); plaintiff requests relief from potential default based on any untimely filings, (Docket No. 84); and Delta King objects to plaintiff's sur-reply, (Docket No. 86). Suffice to say that each party has had the opportunity to be fully heard and the court will focus on the substance of the motion for summary judgment. The court will also decline plaintiff's vague invitation to "consider exercising discretion to cross-grant summary judgment where appropriate." (Pl.'s Opp'n at 1:6–7 (Docket No. 74).)

Along a similar vein, Delta King filed sixty-one formulaic and conclusory objections to the statements in plaintiff's declarations. (Docket No. 80–2.) In the thirteen pages of objections, Delta King simply cuts and pastes various objections without a single attempt to offer any helpful analysis. As the court has repeatedly explained, "Objections to evidence on the ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 889 F.Supp.2d 1198, 1215 (E.D.Cal.2012) (citing *Burch v. Regents of the Univ. of Cal.*, 433 F.Supp.2d 1110, 1119–20 (E.D.Cal.2006)). "Similarly, statements based on speculation, improper legal conclusions, personal knowledge, or argumentative statements are not *facts* and can only be considered as arguments, not as facts, on a motion for summary judgment." *Id.* Assuming Delta King actually intended that the court give serious consideration to any of its rote objections and to the extent that the court relies on any of the declarations, the court overrules Delta King's objections.

evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...." *Id.*

## A. Relevant Statutes

### 1. The ADA

The ADA prohibits discrimination against any individual on the basis of disability in a place of public accommodation. 42 U.S.C. § 12182(a). "The statute provides a 'comprehensive,' 'broad mandate' to eliminate discrimination against disabled persons, addressing both 'outright intentional exclusion' as well as the 'failure to make modifications to existing facilities and practices.'" *Fortyune v. City of Lomita,* 766 F.3d 1098, 1101 (9th Cir.2014). "The concept of 'discrimination' under the ADA does not extend only to obviously exclusionary conduct-such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance." *Chapman v. Pier 1 Imports (U.S.) Inc.,* 631 F.3d 939, 945 (9th Cir.2011). "Rather, the ADA proscribes more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' 'full and equal enjoyment' of places of public accommodation." *Id.* (quoting 42 U.S.C. § 12182(a)). "[A] private plaintiff can sue only for injunctive relief (i.e., for removal of the barrier) under the ADA." *Oliver v. Ralphs Grocery Co.,* 654 F.3d 903, 905 (9th Cir.2011).

The ADA specifically prohibits any person who owns, leases, or operates a place of public accommodation from "fail[ing] to remove architectural barriers" in existing facilities "where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). For newly constructed facilities or for "alterations" made to existing facilities, the ADA requires that the facilities be "readily accessible to and usable by individuals with disabilities." *Id.* § 12183(a)(1)-(2).

"Congress directed the Department of Justice ... to issue regulations that provide substantive standards applicable to facilities covered under Title III." *Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.,* 339 F.3d 1126, 1129 (9th Cir.2003). "The[ ] standards lay out the technical structural requirements of places of public accommodation and are applicable 'during the design, construction, and alteration of such buildings and facilities ... under the [ADA].'" *Fortyune v. Am. Multi–Cinema, Inc.,* 364 F.3d 1075, 1080–81 (9th Cir.2004) (quoting 28 C.F.R. pt. 36, app. A) (alterations in original). The Department of Justice first adopted the 1991 ADA Standards for Accessible Design, which are commonly referred to as the "ADAAG," and subsequently revised those standards in 1994. *See* 28 C.F.R. Pt. 36, app. A. In 2010, the Department of Justice adopted the 2010 Design Standards for Accessible Design ("2010 Design Standards"). The ADAAG was in effect for new construction and alterations until March 14, 2012, and the 2010 Design Standards became effective for new construction and alterations on or after March 15, 2012.

### 2. California Health & Safety Code Section 19955

Section 19955 of the California Health and Safety Code requires that all public accommodations adhere to the provisions of sections 4450 through 4461 of

the California Government Code. Cal. Health & Safety Code § 19955(a). Section 4450 authorizes the State Architect to develop and submit building standards to ensure that all buildings and facilities are "accessible to and usable by persons with disabilities." Cal. Gov't Code § 4450. Although a plaintiff can obtain injunctive relief to remedy a violation of section 19955, *see* Cal. Civ.Code § 55, the statute "does not authorize an action for damages." *Botosan v. Fitzhugh,* 13 F.Supp.2d 1047, 1052 (S.D.Cal.1998) (citing *Donald v. Cafe Royale, Inc.,* 218 Cal.App.3d 168, 183, 266 Cal.Rptr. 804 (1st Dist.1990)).

### 3. *Unruh Civil Rights Act*

The Unruh Act provides, in relevant part, that every person is "entitled to the full and equal accommodations, advantages, privileges, or services in all business establishments of every kind whatsoever" notwithstanding his or her disability. Cal. Civ.Code § 51(b). "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51" is liable under UCRA for damages and attorney's fees. *Id.* § 52. Any violation of the ADA is also a violation of the Unruh Act. *Id.* § 51(f).

■ In order to recover under the Unruh Act for a violation of the ADA, a plaintiff need not show that he suffered intentional discrimination. *Munson v. Del Taco, Inc.,* 46 Cal.4th 661, 665, 94 Cal. Rptr.3d 685, 208 P.3d 623 (2009). However, "[t]o the extent [p]laintiff seeks to make an Unruh Act claim separate from an ADA claim, she must allege intentional discrimination." *Wilkins–Jones v. County of Alameda,* 859 F.Supp.2d 1039, 1051 (N.D.Cal.2012) (citations omitted); *Munson,* 46 Cal.4th at 668, 94 Cal.Rptr.3d 685, 208 P.3d 623 ("[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimina-

tion...." (citations and internal quotation marks omitted)).

### 4. *California Disabled Persons Act*

The CDPA provides that "individuals with disabilities shall be entitled to full and equal access ... to ... places of public accommodation." Cal. Civ.Code § 54.1. The CDPA also provides a private right of action whereby individuals who are denied admission to or enjoyment of public facilities can recover damages and attorney's fees. *Id.* § 54.3.

■ However, "a structural impediment does not violate the [CDPA] unless the impediment also violates a structural access standard." *Hankins v. El Torito Rests.,* 63 Cal.App.4th 510, 522, 74 Cal. Rptr.2d 684 (1st Dist.1998). The CDPA "does not impose an affirmative duty to eliminate access barriers except as required by specific building standards." *Californians for Disability Rights v. Mervyn's LLC,* 165 Cal.App.4th 571, 587, 81 Cal.Rptr.3d 144 (1st Dist.2008) (citing *Marsh v. Edwards Theatres Circuit, Inc.,* 64 Cal.App.3d 881, 134 Cal.Rptr. 844 (2d Dist.1976)). Those standards, not "the [C]DPA's general guarantee of full and equal access," determine a defendant's liability under the CPDA. *Id.*

### B. *Access Infrastructure Under the ADA and California Law*

#### 1. *Ramps vs. Gangways*

■ At the time the Delta King was restored in 1984, the California Building Code ("CBC") required that ramps providing access to buildings or structures could not exceed a slope of 1 foot rise in 12 feet ("12:1"), or a grade of 8.33%. (Post Decl. Ex. 29 at 94.) Since enactment of the ADA in 1990, the parties agree that all relevant standards have similarly required a 12:1 slope ratio for ramps. For example,

section 405.2 of the 2010 Design Standards provides that "[r]amp runs shall have a running slope not steeper than 1:12."

Delta King first contends that it was not required to comply with the 12:1 slope requirement for ramps in the 1984 CBC because the sloped access walkways to the Delta King are gangways, not ramps, and the CBC did not regulate gangways in 1984. Common sense dictates, however, that a gangway is simply a type of ramp. In fact, Delta King's copy of the Manuscript Plan Set repeatedly labels its pedestrian walkways providing access as "ramps." (*See* M. Coyne Decl. Ex. 7 at A–2 (Docket No. 59).) Delta King's citation to the Wikipedia National Dictionary's definition of a "gangway" as "an articulating bridge *or ramp*, such as from land to a dock or a ship" underscores that a gangway is simply a subspecies of a ramp. (Delta King's Mem. at 29:17–18 (Docket No. 54–1) (emphasis added)); *see also* 2010 Design Standards § 106.5 (defining "ramp" as "[a] *walking surface* that has a running slope steeper than 1:20" and "gangway" as "[a] *variable-sloped pedestrian walkway* that links a fixed structure or land with a floating structure") (emphasis added).

Therefore, although the sloped pedestrian walkways providing access to the Delta King are gangways, they also come under the broader description of a ramp. The fact that the various ADA and California regulations subsequently determined that the unique characteristics of some gangways justified exemptions from the 12:1 slope ratio for ramps does not mean that gangways were not regulated as ramps prior to the exceptions. The very creation of the exceptions confirms that the standard 12:1 ratio applied. Accordingly, the 12:1 slope in the CBC applied to Delta King's gangways when it was restored in 1984. To the extent Delta King argues

that its gangways do not pose barriers under the ADA because they comply with the ADAAG or 2010 Design Standards, the 12:1 slope similarly controls.

*2. Compliance with the 12:1 Slope*

 To establish that the Elevator and Aft Gangways comply with the 12:1 slope requirement, Delta King relies on the declaration of Charles Coyne, who owns twenty percent of the shares of the Delta King and served as the General Manager from 1991 to 2005 and 2007 to 2013. (C. Coyne Decl. ¶ 2 (Docket No. 60).) Utilizing water levels recorded by the California Department of Water Resources ("DWR"), Charles used "simple geometry" to calculate the slope of the Delta King's two gangways. (*Id.* ¶ 12.) Specifically, the DWR recorded water levels for the Sacramento River at the I Street Bridge, which is about 400 yards north of the Delta King. (*Id.* ¶ 11.) Since approximately January 1, 2001, the DWR has measured and recorded the water levels of the Sacramento River at the I Street Bridge each day and posted them on its website. (*Id.*) From 1998 to January 1, 2001, only incomplete recorded measurements are available. (*Id.*)

On June 14, 2014, Charles measured the vertical distance from the water level to the boardwalk, Elevator Gangway connection point, the direct barge connection point, and the Aft Gangway connection point. (*Id.*) Taking those measurements, along with the water height at the I Street Bridge on June 14, 2014 and the length and width of each gangway, Charles represents that he was able to calculate the slope of each gangway on June 14, 2014. (*Id.*) He indicates that he was then able to utilize "simple geometry[ ]" to determine the slop of the gangways at any river height." (*Id.*) According to Charles's calculations, there was only one day from January 1, 2001 to June 14, 2014 when

neither the Elevator Gangway nor the Aft Gangway had at least a 12:1 slope. (*Id.*)

This evidence is insufficient to withstand summary judgment for two reasons. First, assuming their accuracy, Charles's calculations do not establish that the Elevator and Aft Gangways are compliant. He indicates only that on every day except one since January 2, 2001, at least one of the two gangways was compliant. Delta King does not argue, however, that one gangway could exceed the 12:1 slope so long as the other gangway offered plaintiff access with a 12:1 slope. Plaintiff's expert, Zachery Reynolds, states that the slope of the Aft Gangway "taken during normal inspection at random periods all indicated a slope greater than a 1:12 ratio," and "for all but the smallest percent of time, the aft access slope to the Hotel is on a 10% (1:10) to 16% (1:6) grade." (Reynolds Decl. ¶ 12, Exs. 202, 203 (Docket No. 69).)

Second, Reynolds also disputes the accuracy of Charles's calculations. Reynolds is a naval architect with forty-five years of experience and has reached the "provisional opinion that [Charles] has used non-reliable and inaccurate data." (*Id.* ¶ 3.) Reynolds explains that the DWR's water level readings from the I Street Bridge are "calibrated and calculated from a gage reading where the datum is 0.0 (zero)" and that such measurements do not accurately reflect the water level at the Delta King.

(*Id.* ¶¶ 4–12.) At summary judgment, the court cannot weigh the reliability of Charles's method of calculating the slopes of the gangways against Reynolds's opinion that the calculations are inaccurate. *See Scharf v. U.S. Att'y Gen.*, 597 F.2d 1240, 1243 (9th Cir.1979) (holding that resolution of issues of fact based on conflicting expert testimony is "not the court's function on summary judgment").[3]

Accordingly, Delta King is not entitled to summary adjudication on the ground that the slopes of the Elevator and Aft gangways comply with the 12:1 slope requirement.

3. *"Recreational Boating Facilities" Exceptions*

■ Next, Delta King contends that the Elevator and Aft Gangways do not constitute barriers under the ADA because they come within the slope exception in section 1003.1 of the 2010 Design Standards. Section 1003 governs "recreational boating facilities" and specifically covers the slope and other requirements of "gangways."[4] The exceptions provided for "gangways" in the 2010 Design Standards are limited to "[a]ccessible routes serving recreational boating facilities." 2010 Design Standards, § 1003.2. The issue is thus whether Delta King can rely on the "recreational boating facilities" exceptions for gangways

**3.** Because the court does not rely on Charles's declaration to grant Delta King's motion for summary judgment, it need not resolve plaintiff's objection to his declaration on the ground that he was not disclosed as an expert witness or qualified as an expert.

**4.** Delta King also relies on section 15 of the United States Access Board's version of ADAAG, which addresses exceptions applicable to "recreational facilities," including "boating facilities." *See* United States Access Board ADA Accessibility Guidelines § 15 (Sept.2002), http://www.access-board.gov/guidelines-and-standards/buildings-and-sites/

about-the-ada-standards/background/adaag (last visited Sept. 24, 2014). Although the United States Access Board published the ADAAG in 1991, it did not publish Section 15 until 2002. More importantly, the Department of Justice has not adopted section 15 and the Access Board indicates that "Section 15 has not been incorporated in the Department of Justice accessibility standards and therefore is not enforceable." *Id.* The court will therefore not rely on the exceptions in section 15 of the Access Board's version of ADAAG.

to exempt the Elevator and Aft Gangways from compliance with the 12:1 slope.[5]

The challenges the Delta King faces in providing accessible gangways are precisely the type of challenges the Department of Justice contemplated when it enacted the 2010 Design Standards. In the commentary discussing the exception for recreational boating facilities, the Department of Justice explained,

> Section 1003.2.1 provides a list of exceptions applicable to structures such as gangways, transition plates, floating piers, and structures containing combinations of these elements *that are affected by water level changes*. The list of exceptions specifies alternate design requirements applicable to these structures which, *because of water level variables*, cannot comply with the slope, cross slope, and handrail requirements for fixed ramps contained in sections 403.3, 405.2, 405.3, 405.6, and 405.7 of the 2010 Standards.

28 C.F.R. pt. 36, app. B (emphasis added).

Nonetheless, while the varying levels of water on the Sacramento River cause the same challenges for the Delta King's gangways as the challenges the Department of Justice contemplated in enacting the exceptions for "recreational boating facilities," it cannot persuasively be argued that the Delta King is a "recreational boating facility." In its analysis of the commentary received prior to adopting the exceptions for recreational boating facilities, the Department of Justice focused on facilities providing access to boats. *See* 28 C.F.R. pt. 26, app. B ("[T]he 2010 Standards require an accessible route to all accessible boating facilities, *including boat slips and boarding piers at boat launch ramps*.") (emphasis added); *see also* 67 Fed.Reg. 56352–01, 56357 (Sept. 3, 2002) ("The Board is concerned that those involved in the design and construction of *boat and ferry docks* may not have been fully aware of the proposed rule and therefore may not have evaluated its impact on such facilities. In addition, through the proposed rule, the Board sought information to establish access provisions for gangways based on the size of *vessels using floating piers*.") (emphasis added).[6]

The Department of Justice could have simply applied the exceptions to "gangways." It did not. After broadly defining the term "gangway," it unequivocally limited the slope exceptions to gangways accessing recreational boating facilities. The Ninth Circuit has repeatedly instructed courts to " 'construe the language of the ADA broadly to advance its remedial purpose.' " *Fortyune v. City of Lomita*, 766 F.3d at 1101 (quoting *Cohen v. City of Culver City*, 754 F.3d 690, 694 (9th Cir. 2014)); *see also Guerrero v. Santo Thomas*, No. CVA09–027, 2010 WL 3526453, at *5 (Guam Terr. Sept. 8, 2010) ("[W]hen construing remedial legislation, we nar-

---

**5.** Plaintiff repeatedly argues that Delta King is no longer a "boat." Although Delta King points out how it is similar to a boat in many respects, it does not argue that it is a "boat" or is exempt from the ADA as a "boat." If Delta King were a boat, the 2010 Design Standards would not govern its gangways. *See* 2010 Design Standards, § 106.5 (stating, in the definition of "gangway," that "[g]angways that connect to vessels are not addressed by this document").

**6.** The only federal definition for "recreational boating facilities" appears in Coast Guard regulations addressing the transport of oil and other substances. This definition would exclude the Delta King. *See* 33 C.F.R. § 158.120 (" 'Recreational boating facility' means a facility that is capable of *providing wharfage or other services for 10 or more recreational vessels*. It includes, but is not limited to, marinas, boatyards, and yacht clubs, but does not include a place or facility containing only an unattended launching ramp.") (emphasis added).

rowly construe exceptions and apply them only to situations which are plainly and unmistakably consistent with the terms and spirit of the legislation."). As the Ninth Circuit has explained,

> Our concern for the protective purposes of remedial legislation ... does not vest this court with a license to rewrite the statute.... It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort. Our compass is not to read a statute to reach what we perceive—or even what we think a reasonable person should perceive—is a sensible result.

*S.E.C. v. Gemstar–TV Guide Intern., Inc.,* 401 F.3d 1031, 1053 (9th Cir.2005) (internal quotation marks and citation omitted) (first omission in original). Accordingly, Delta King cannot rely on the slope exceptions for recreational boating facilities to establish that the Elevator and Aft Gangways comply with the 2010 Design Standards.

The same analysis excludes application of the exceptions for particular gangways in the California Department of Boating and Waterways' 2005 Layout and Design Guidelines for Marina Berthing Facilities ("CDBW Guidelines"). The CDBW Guidelines "provide technical assistance and direction in the planning, design and construction of marina berthing facilities" and define "marina" as "a recreational boating facility on a coastal or inland waterfront that provides facilities and services for the wet and/or dry storage of boats, as well as embarking and disembarking of boat operators and passengers." (Pl.'s Req. for Judicial Notice Ex. 219 (CDBW Guidelines)

at iii); *see also* Cal.Code Regs. tit. 14, § 6565.2 (defining "[r]ecreational boat" as "any vessel manufactured or used primarily for noncommercial use; or leased, rented, or chartered to another for the latter's noncommercial use," but not "a vessel engaged in the carrying of six or fewer passengers"). Accordingly, because the gangways leading to the Delta King are subject to the 12:1 slope ratio and the Delta King has not established as a matter of law that the Elevator and Aft Gangways comply with that slope, the court will deny Delta King's motion for summary adjudication with respect to its access infrastructure.[7]

## C. Alterations Under the ADA

Subsection 12183(a)(2) of the ADA provides that if a facility is "altered ... in a manner that affects or could affect the usability of the facility," the alterations must be made "in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(2). In the absence of a definition of "altered" or "alterations" in the ADA, courts have looked to the definition provided in the Department of Justice's implementing regulations. *Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 369 (2d Cir.2008). The regulations define alteration as "a change to a place of public accommodation or commercial facility that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b). Although neither the ADA nor the implementing regulations define "usability," the

---

**7.** Delta King has not moved for summary judgment on the ground that the Elevator and Aft Gangways comply with the ADA because any modifications to remedy their slopes are not readily achievable.

In her opposition, plaintiff argues that adding the required handrails and extensions to

the Aft Gangway are readily achievable. (Pl.'s Opp'n at 27.) The court will not address this proposed modification because Delta King did not seek summary adjudication on that issue.

regulations provide the following illustrations as to what may or may not amount to an alteration:

> Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

*Id.* § 36.402(b)(1). The Department of Justice has commented that it "remains convinced that the [ADA] requires the concept of 'usability' to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." 56 Fed.Reg. 35544, 35581 (July 26, 1991); *accord* H.R.Rep. No. 101–485(III) (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 487 ("Usability should be broadly defined to include renovations which affect the use of facility, and not simply changes which relate directly to access.").

While "few courts in the Ninth Circuit have interpreted 'usability' when assessing if an alteration has occurred," courts outside this circuit "have tended to take an expansive view of alterations that affect usability." *Rodriguez v. Barrita, Inc.,* 10 F.Supp.3d 1062, 1081 (N.D.Cal.2014) (citing cases). In *Roberts,* the Second Circuit

contrasted alterations under the ADA with new construction, concluding that "alterations" seem to exclude "modifications that essentially preserve the status and condition of a facility, rather than rendering it materially 'new' in some sense." 542 F.3d at 370. It concluded that a court could consider the following non-exhaustive factors to determine whether a modification amounted to an alteration:

> 1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof.
> 2. The scope of the modification (including what portion of the facility or relevant part thereof was modified).
> 3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility).
> 4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.

*Id.*[8]

Courts have emphasized that "Congress' discussion of 'affecting usability' focused on the 'primary function' of a facility." *Kinney v. Yerusalim,* 9 F.3d 1067, 1073 (3d Cir.1993); *accord Alford v. City of Cannon Beach,* No. CV–00–303–HU, 2000 WL 33200554, at *6 (D.Or. Jan. 17, 2000). "Areas containing primary functions refer to those portions of a place of public accommodations where significant goods, services, facilities, privileges, advantages

---

**8.** The parties dispute, and the Ninth Circuit has not resolved, which party has the burden of proof on the alteration issue. In the absence of any guidance in the ADA or implementing regulations, the Second Circuit concluded that the plaintiff has the initial burden of production on the issue and meets that burden "by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA." *Id.* at 371. If the plaintiff meets this initial burden, the Second Circuit concluded that the "defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration." *Id.* Here, allocation of the burden on this issue would not affect the court's conclusion.

or accommodations are provided," such as "the path of travel [,] ... bathrooms, telephones, and drinking fountains." H.R.Rep. No. 101–485(III), *reprinted in* 1990 U.S.C.C.A.N. 445, 487. Despite Delta King's attempt to argue otherwise, it seems obvious that a hotel room and its bathroom are a primary function of a hotel.

Although Delta King recounts all work that has been performed since the initial rehabilitation, plaintiff argues only that alterations occurred in 2008. Plaintiff relies on an article from May 19, 2008 in *The Sacramento Bee* describing a "six-figure makeover":

> Each of the 44 staterooms is being upgraded, with new furniture, bedding, HD–TVs and Wi–Fi connections.... Other changes include new carpeting as well as new tables in lounges and on the scenic second-level outdoor deck.... The upgrades[ are] to be completed next month and [will] cost[ ] "several hundred thousand dollars...."

(Thimesch Decl. Ex. 169.)

According to Delta King, the hotel rooms were refurbished in 2000 and some shower and bathroom floors in the rooms were resurfaced in 2008. For the remodels in 2000, the "renovation" cost was approximately $700 per hotel room and occurred over two years. (C. Coyne Decl. ¶ 28.) The room renovations in 2000 included removing and replacing wallpaper,

painting walls, replacing worn and broken blinds, lamps, side tables, and bed spreads. (*Id.*) According to Charles, "[a]ll replaced furniture and fixtures served the same function and were of substantially the same dimensions as the worn furniture and fixtures they replaced." (*Id.*) In 2008 or 2009, Delta King indicates that fiberglass sheeting was placed over the tile surfaces of the showers and bathroom floors in twenty to twenty-five hotel rooms. (*Id.* ¶¶ 26–27; M. Coyne Dep. at 241:14–1, 245:5–8.) The fiberglass sheeting was installed in an effort to address a mold problem and provided a "water barrier that was attractive." (C. Coyne Decl. ¶ 27.)

Delta King's descriptions of the hotel room remodels in 2000 that cost approximately $30,800 and the installation of fiberglass sheeting on shower and bathroom floors in 2008 vary drastically from the reported "six-figure makeover" in 2008 that was described in *The Sacramento Bee*. Delta King objects to the court taking judicial notice of the *The Sacramento Bee* article, but does not respond to the alleged "six-figure makeover" in 2008.[9] In his deposition, however, Michael Coyne testified that Delta King had advertised having newly remodeled rooms in 2008. (M. Coyne Dep. at 242:2–7.) Taking all reasonable inferences in favor of plaintiff, it is unlikely Delta King advertised a remodel that consisted only of installing fiberglass sheeting to some of its shower and bathroom floors. A genuine dispute therefore

---

**9.** It is doubtful that the court can properly take judicial notice of *The Sacramento Bee* article. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 578 F.3d 1016, 1022 (9th Cir.2009) ("Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.' "). *But see Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458–59 (9th Cir.1995) (concluding that the district court did not err in taking judicial notice of layoffs in newspaper

article because, under Federal Rule of Evidence 201(b), the layoffs "would be generally known in Southern California and [ ] would be capable of sufficiently accurate and ready determination").

Nonetheless, while the court does not rely on the article in denying Delta King's motion for summary adjudication with respect to alterations, it questions why Delta King failed to respond to the alleged 2008 "six-figure makeover" reported in the article.

exists as to the remodeling performed in 2008.

With the only work Delta King identifies as having been performed in 2008—the shower and bathroom floor resurfacing—the court also lacks sufficient details about those improvements. *See* H. Comm. on Educ. & Labor Rep. No. 485(II) (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 394–95 ("Changes to floors may or may not affect accessibility or usability, depending upon the nature of the change involved."). Although Delta King explains that the resurfacing provided a water barrier to remedy mold, the court lacks evidence explaining the process of installing the fiberglass sheeting and whether the work could have affected the usability of the bathrooms and showers.

In *Kinney*, the Third Circuit held that resurfacing of streets affected the usability of the streets and thereby constituted an alteration under the ADA. 9 F.3d at 1073–74. The Third Circuit reasoned that resurfacing "involves more than minor repairs or maintenance" and, because resurfacing "helps to prevent damage to vehicles and injury to people," the improvement from resurfacing makes the street "more usable in a fundamental way." *Id.* By analogy, mold in a bathroom is not only unsightly, but could pose a health concern. A trier of fact could find that Delta King's resurfacing eliminated any health risks and made the showers and bathrooms more usable for its guests. When considered in light of the mandate to interpret "usability" broadly and the absence of evidence about the cost and scope of the work, the court cannot find that the installation of the fiberglass sheeting did not constitute an alteration as a matter of law.

Accordingly, because a genuine issue of material fact exists as to whether Delta King performed any alterations, the court must deny its motion for summary adjudication on that issue.[10]

### D. *California Health and Safety Code Section 19956 Exception for Vertical Access*

 California Health and Safety Code section 19956 provides:

[T]he following types of privately funded multistory buildings do not require accessibility by ramp or elevator above and below the first floor: . . . (b) Any other privately funded multistoried building that is not a shopping center, shopping mall, or the professional office of a health care provider, and that is less than three stories high or less than 3,000 square feet per story if a reasonable portion of all facilities and accommodations normally sought and used by the public in such a building are accessible to and usable by persons with disabilities.

Cal. Health & Safety Code § 19956.[11] In its memorandum, Delta King does not cite

---

**10.** The court need not address whether any modifications are readily achievable because that standard is relevant only if the Delta King did not undergo any alterations.

**11.** Relying on subsection 2–105(b)(11)(B)(4) of the 1984 version of Title 24, plaintiff argues that the exception provided in section 19956 is limited to facilities that were "existing" when the section became operative in 1970. Not only is this severely limiting interpretation of section 19956 inconsistent with the

plain language of the statute and cases applying the section to facilities that were constructed after 1970, *see, e.g., People ex rel. Deukmejian v. CHE, Inc.*, 150 Cal.App.3d 123, 197 Cal.Rptr. 484 (4th Dist.1983), it is also based on an incorrect reading of the 1984 version of Title 24. Subsection 2–105(b)(11)(B) identifies the various structures governed by Title 24 and subsection 2–105(b)(11)(B)(4) extends application to "existing privately funded public accommodations when alterations, structural repairs, or addi-

to any evidence showing that each deck is less than 3,000 square feet. Although plaintiff did not dispute that each deck is less than 3,000 square feet, plaintiff's counsel suggested at oral argument that each deck is 10,000 square feet. Nonetheless, even if the court assumes that the square footage of the decks brings Delta King within section 19956, Delta King is excused from providing access to the fourth and fifth decks only if "a reasonable portion of all facilities and accommodations" offered on the fourth and fifth decks are available on the first three decks.

When discussing application of section 19956 to a restaurant, a California appellate court indicated that the section "would exempt a restaurant with accessible, *equivalent* dining areas on both the first and second floors from having to provide access to tables on the second floor." *People ex rel. Deukmejian v. CHE, Inc.*, 150 Cal. App.3d 123, 136, 197 Cal.Rptr. 484 (4th Dist.1983) (emphasis added). Plaintiff has established a genuine dispute as to whether the Delta Bar and Grill offerings on the third deck provide a "reasonable portion" or are equivalent to the offerings on the fourth deck.

A trier of fact could find that seating offered at the base of a staircase does not provide the equivalent ambience, experience, and scenic view as seating at the Delta Bar and Grill. *Cf. Donald v. Cafe Royale, Inc.*, 218 Cal.App.3d 168, 182, 266 Cal.Rptr. 804 (1st Dist.1990) (finding that a restaurant seating area for disabled patrons in a separate "lower level lounge area" did not provide equal access to the "two raised tiers of the main dining area"). Disabled patrons also learned of the available seating only after inquiring whether they could order a drink from the inacces-

sible Delta Bar and Grill. (*See* M. Coyne Dep. at 168:18–169:5.) A trier of fact could also find that being able to hear a live band playing on a higher deck is not equivalent to being able to watch the band and partake in the live music experience. These findings would be consistent with the opinion of plaintiff's expert, Peter Blanck, Ph.D., that the alternate seating and ability to hear the live music does not offer an equivalent accommodation and is stigmatizing for disabled patrons. (*See* Thimesch Decl. Ex. 200, ¶¶ 15, 23–26.) It is also undisputed that a TV is available for patrons at the Delta Bar and Grill, but not for patrons in the separate seating on the third deck.

Accordingly, because a rational trier of fact could find that the first three decks do not provide a reasonable portion of the offerings on the fourth and fifth decks, the court will deny Delta King's motion for summary judgment on the ground that section 19956 exempts it from having to provide vertical access to the fourth and fifth decks.

### E. *Historic Exemptions During Restoration*

■ Originally enacted in 1975, the purpose of the California Historical Building Code ("CHBC") is to

provide alternative regulations and standards for the rehabilitation, preservation, restoration (including related reconstruction), or relocation of qualified historical buildings or structures ... so as to preserve their original or restored architectural elements and features, to encourage energy conservation and a cost-effective approach to preservation, and to provide for the safety of the building occupants.

tions are made" to them. The subsection then refers to the section 19956 exception, indicating that public accommodations that

come within section 19956 are not required to provide vertical access when alterations, structural repairs, or additions are made.

Cal. Health & Safety Code § 18951; *see also* Cal. Health & Safety Code § 18953 ("It is the intent of this part to provide means for the preservation of the historical value of qualified historical buildings or structures and, concurrently, ... to provide reasonable availability to and usability by, the disabled.").

It is undisputed that the Delta King is a qualified historical structure under the CHBC because it has been designated as a historical site and is included on the National Register of Historical Places. *See* Cal. Health & Safety Code § 18955 (providing that qualified historical buildings or structures include those that have been "deemed of importance to the history, architecture, or culture of an area by an appropriate local or state governmental jurisdiction," including "historical buildings or structures on existing or future national, state or local historical registers or official inventories"); (Post Decl. ¶ 3, Exs. 19, 20).

At the time the Delta King was restored, section 8–1304 of the 1979 California Historical Building Code exempted "strict compliance" with the requirements for access and permitted "alternative provisions for access" in order to preserve the historical fabric of a structure if the following conditions were satisfied:

(a) such alternative provisions shall be applied only on an item-by-item or case-by-case basis. (see Table 8–13–1)

(b) the alternative standards are applied according to the priorities outlined in Table 13–2 whereby the alternative providing the most access is listed first.

(c) the official charged with enforcement of the standards shall provide written documentation stating the reasons for the application of the alternative standards. Such statement should include the opinion and/or comments of a representative local group of disabled people and shall be available to the public on request.

(Thimesch Decl. Ex. 123 (1979 California State Historical Building Code, Title 24 Building Standards, Part 8, *as reprinted in* 1985).) If the alternative standards under section 8–1304 would destroy the historical fabric or aspects, section 8–1306 provided for an "exemption from the literal requirements for full and equal access" under the following conditions:

(a) such exemption is considered only on an item by item or case by case basis.

(b) interpretive exhibits and/or equal services of the exempted significant historical aspects are provided for the public in a location fully accessible to and useable by the disabled, including people with hearing and sight impairment.

(c) services must be provided in an accessible location equal to those provided in the exempted location.

(d) the official charged with enforcement of the standards shall provide written documentation stating the reasons for the consequent exemption. Such statement shall include the opinion and/or comments of a representative local group of disabled people and shall be available to the public on request.

(*Id.* Ex. 123.)

Section 2–7101(b) of Title 24 of the 1984 California Building Code provided, "In existing buildings, when the enforcing agency determines that compliance with any regulation under this section would create an unreasonable hardship, an exception shall be granted when equivalent facilitation is provided." (Post Decl. Ex. 29 at 25.) Section 2–422(c) of the 1984 California Building Code indicated that an "unreasonable hardship" exists when compliance with the standard would make the project "unfeasible" based on:

1. The cost of providing access.

2. The cost of all construction contemplated.

3. The impact of the proposed improvements on financial feasibility of the project.

4. The nature of the accessibility which would be gained or lost.

5. The nature of the use of the facility under construction and its availability to handicapped persons.

(*Id.* Ex. 29 at 19.) It further required that "[t]he details of any finding of unreasonable hardship shall be recorded and entered in the files of the enforcing agency." (*Id.*)

Lastly, Health and Safety Code section 19957, which was effective as of July 1, 1970, provided,

> In cases of practical difficulty, unnecessary hardship, or extreme differences, a building department responsible for the enforcement of this part may grant exceptions from the literal requirements of the standards and specifications required by this part or permit the use of other methods or materials, but only when it is clearly evident that equivalent facilitation and protection are thereby secured.

Delta King contends that the Sacramento Building Department applied the relevant accessibility requirements to the extent feasible and, when the requirements compromised the historic fabric of the Delta King, the Building Department utilized the CHBC and granted exceptions. The City, Building Department, and Delta King are unable to locate the approved building plans and other correspondence related to the restoration and any granted exceptions. (*See* Post. Decl. Ex. 27 (Klock–Johnson Dep.); M. Coyne Decl. ¶ 11.) Delta King therefore seeks to prove the existence of the requisite approvals and exceptions—and thereby compliance with the state accessibility standards—through

individuals involved in the restoration and Delta King's purported copy of the Manuscript Plan Set.

Solon Wisham, Jr., was the assistant Sacramento city manager from 1981 to 1991 and "served as a liaison between the developers of the Delta King and the City of Sacramento." (Wisham Decl. ¶ 5.) He indicates that the goal "was to find a way to preserve as much of the original appearance and design of the vessel as possible in a way consistent with then-existing standards as a hotel and public accommodation." (*Id.* ¶ 7.) Wisham specifically explains,

> Numerous ideas were discussed and ultimately the City, acting through its building department, exercised its discretion to determine what aspects of the California Building Code, inclusive of the Historic Building Code, would be applied to the vessel.... The decisions about access to the vessel, the number of ramps, the use of an exterior elevator on a floating elevator barge, decisions about what decks within the vessel would be rendered accessible to disabled person by use of an internally installed elevator, the decision to retain inherent maritime features such as coamings, door thresholds, and cambered docks all were compromises made by the City while balancing the objective of preserving the existing historical fabric, maintaining the character and silhouette of the vessel, with the intended operation of the vessel as a functioning hotel largely accessible to disabled persons.

(*Id.* ¶ 8.)

Tim Sullivan was the chief building inspector for the Building Department from 1984 to 1996. (Sullivan Decl. ¶ 2.) Sullivan similarly recounts how the project required balancing preserving the historic characteristics of the Delta King against

transforming it and providing accessibility to disabled persons. (*Id.* ¶ 5.) He specifically explains:

> The tilt or camber of decks was considered, as were general path of travel and access to the various features within the vessel. Although I have no particular recollection of the discussion, . . . I understand and believe that [an] equivalent facilitation determination was made by the Building Department based upon the decision that cocktail seating and drinks would be available to disabled patrons (and others) on the third floor and that that was equivalent to the view, ambiance, and facility service made available on the fourth floor cocktail area.

(*Id.* ¶ 8.)

Edmund and Michael Coyne recount a similar process. (*See* E. Coyne Decl. ¶¶ 12, 16; M. Coyne Decl. ¶¶ 7–9.) Edmund recalls that the Sacramento Building Department made the following determinations and exemptions: 1) vertical access to the fourth and fifth decks was not required because equivalent facilities were provided on the first three decks; 2) the leveling of the original camber and tilt of many decks was not required; 3) the original openings, including windows, portholes, exterior door thresholds and coamings, need not be altered; and 4) the original stairways and exterior doorways need not be altered. (E. Coyne Decl. ¶ 16.)

Although all of the Building Department's records were lost or destroyed, Michael, who was "present during most of the construction," was able to locate his copy of the Building Department's Manuscript Plan Set. (M. Coyne Decl. ¶¶ 1, 5, 12.) Michael indicates that his set did not include the Building Department's notations, but he had "transcribe[d] all the hand written notes and details from the Building Department's Approved Plan Set" on the Delta King's copy. (*Id.* ¶ 12.) Notwithstanding the difficulty of reading the transcriptions on the copy before the court, it is questionable whether Michael's copy is a complete copy of the final approved plan. For example, green handwritten notations state "TO BE UPDATED" on page A–6 and "This page needs to be updated" on page A–7. (*See* M. Coyne Decl. Ex. 7 at A–6, A–7.)

While Delta King will ultimately have to rely on this copy and the faded recollections of the individuals involved in restoration of the Delta King to establish the grant of any exceptions, the copy and the individuals' deposition testimony [12] and declarations are insufficient to establish the absence of a genuine issue of material fact that the proper procedures were followed and particular accessibility exemptions were granted.

As to the procedures followed, prerequisites for an exemption under section 8–1306 of the 1979 Historical Building Code

---

**12.** Based on their deposition testimony, plaintiff objects to the court's consideration of the declarations of Wisham, Sullivan, and Ed Coyne on the ground that they are sham affidavits. Because the court ultimately does not rely on the affidavits to grant Delta King's motion for summary judgment, it need not resolve whether there is a clear and unambiguous difference between their deposition testimony and declarations. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir.2009) (providing that a court can strike an affidavit as a sham only if the court makes "a factual determination that the contradiction was actually a 'sham' " and that "the inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous"). Assessing these individuals' credibility and the reliability of their memories is precisely the type of inquiry that should be resolved by the trier of fact, not by the court at summary judgment. *See id.* ("[A] court's role in deciding a summary judgment motion is not to make credibility determinations. . . .").

were that "written documentation [memorialized] the reasons for the consequent exemption," including "the opinion and/or comments [of] a representative local group of disabled people and shall be available to the public on request." (Thimesch Decl. Ex. 123.) None of evidence before the court suggests that the Building Department worked with or solicited input from a representative local group of disabled people. Sullivan described the procedure for granting "handicap hardship exceptions" as follows:

> With a review of the plans, a determination of what would be required to gain full compliance, how that could affect the structure probably from a historical standpoint, review of the accommodations that were offered on an accessible level, a decision then would be made to what was a reasonable accommodation or not.

(Sullivan Dep. at 75:7–15.) He does not recall consulting with any disabled advocacy groups, the Mobility Compliance Section of the Department of Rehabilitation, or the State Department of Rehabilitation during the restoration. (*Id.* at 115:12–116:6.) The lack of evidence showing compliance with the requirements of sections 8–1304 and 8–1306 raises a genuine dispute as to whether those sections were in fact utilized to grant any exceptions.

There also remains a dispute about whether the rationale for granting certain alleged exemptions was based on preserving the historic fabric of the Delta King or simply because the Delta King was considered a vessel, not a building or structure. When explaining the approval process, Wisham recollects,

> [T]he City, acting through its building department, exercised its discretion to determine what aspects of the California Building Code, inclusive of the Historic Building Code, would be applied to the vessel. Specifically, I recall decisions by the City that portions of the applicable building code could not possibly apply to this particular project. To begin with, the Delta King has a hull and floats, therefore, provisions of the building code that did not consider hulls, decks and floatation, did not apply.

(Wisham Decl. ¶ 8.) It is unclear what "provisions of the building code" were determined inapplicable simply because the Delta King has a hull and floats, not because the Building Department completed the requisite balancing between preserving its historic fabric and providing accessibility. During his deposition, Wisham also testified that he was unaware of any "exceptions ... that were granted formally by the building department" for the lack of access to the fourth deck or for the gangways. (Wisham Dep. at 66:10–67:24.)

Accordingly, because genuine disputes of fact remain as to whether the Building Department granted particular accessibility exemptions, the court will deny Delta King's motion for summary judgment based any such exemptions.

### F. Motion for a Stay

In the event the court does not summarily adjudicate the alleged Building Department exemptions, Delta King requests that the court stay the action so it can re-apply for the appropriate exemptions from the Building Department. In a letter dated September 17, 1992, the California Attorney General advised local building officials that retroactive hardship exceptions may be granted. (Delta King's Req. for Judicial Notice Ex. A, app. 1 at 1.) The Attorney General specifically explained, "A hardship exception may be granted post-construction where the owner establishes that under the facts that existed at the time the relevant building plans

were approved, an exception would have been granted." (*Id.*)

 "The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones,* 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *accord CMAX, Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir.1962) ("A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants."). The Ninth Circuit has held that a court may stay a case pending resolution of administrative proceedings:

> "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court."

*Lockyer v. Mirant Corp.,* 398 F.3d 1098, 1111 (9th Cir.2005) (quoting *Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 863–64 (9th Cir.1979)). When determining whether to grant a stay, a court must weigh the competing interests, including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc.,* 300 F.2d at 268.

Despite Delta King's request for a stay so that it can apply for retroactive exemptions, it fails to explain why it has not already initiated such proceedings with the Sacramento Building Department. Plaintiff filed this lawsuit over three years ago and the trial is set for December 9, 2014. Now, less than three months before trial, Delta King requests a stay to accomplish what it could have pursued over the past three years. Furthermore, any exemptions Delta King may receive from the Sacramento Building Department will not affect plaintiff's ADA claims. Congress and the state of California have unequivocally expressed their desire to eliminate discrimination against disabled individuals, and this court will not delay plaintiff's attempt to bring that goal to fruition.

IT IS THEREFORE ORDERED THAT Delta King's motion for summary judgment or, alternatively, for a stay be, and the same hereby is, DENIED.